**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 3, 2006
Decided November 1, 2006

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 06-1154

| | |
|---|---|
| ASIZLEE CARTWRIGHT, <br>     *Plaintiff-Appellant,* <br><br>     *v.* <br><br> JO ANNE B. BARNHART, <br> Commissioner of Social Security, <br>     *Defendant-Appellee.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division <br><br> No. 05 C 0685 <br><br> Wayne R. Andersen, <br> *Judge.* |

**ORDER**

Asizlee Cartwright applied for Disability Insurance Benefits, claiming that she was unable to work due to pain in her knees and hands. An administrative law judge ("ALJ") concluded that hand impairments rendered Cartwright disabled as of January 22, 2004, but not before. The Appeals Council denied review, and the district court upheld the ALJ's decision. Cartwright appeals. Because substantial evidence supports the ALJ's decision, we affirm.

## I.

Cartwright is 60 years old. She began working in the mail room at AT&T in 1978 and stayed with the company for 23 years until she was laid off on March 1, 2001. Unfortunately, the next day Cartwright fell down some stairs and injured both knees, particularly the right. In November 2001 she was hired by Check Free but quit after four weeks. In January 2002, she began working for H&R Block as a receptionist. She was hired to work part-time, but it soon became a full-time position. Cartwright's job was seasonal, and she left H&R Block when the tax season ended on April 15, 2002. She has not worked since.

In September 2002 Cartwright applied for Disability Insurance Benefits claiming that she was disabled as of March 2, 2001, due to "knee surgery, joint arthritis, and muscle weakness." In October 2002 she reported to the Social Security Administration ("SSA") claiming that she also had pain and weakness in her hands and arms. In November 2002 a Disability Determination Services ("DDS") examiner reviewed Cartwright's records and concluded that Cartwright had the residual functional capacity to perform sedentary work with a number of limitations. For example, the examiner concluded that due to the carpal tunnel syndrome, she could perform frequent fine and gross manipulation with her hands, but for no more than two-thirds of an eight-hour workday. In March 2003 a second DDS examiner echoed these findings after considering additional medical records provided by Cartwright. Both DDS examiners (who are physicians) concluded that Cartwright was not disabled. The SSA denied Cartwright's application initially in December 2002 and again on reconsideration in March 2003.

In April 2004 Cartwright had another hearing. The ALJ reviewed Cartwright's medical records and heard testimony from her and a vocational expert. The records show that Cartwright underwent an arthroscopic debridement of the right knee in August 2001, and a total knee replacement in June 2002. Progress notes reflect that she was "doing very well" except for occasional reports of mild swelling, stiffness, and weakness in the right knee. The records further indicated that in December 2002 Cartwright's doctor observed that Cartwright was "doing quite well, with full range of motion . . . and will be released to full activities." But a month later Cartwright told a different doctor that she was using her cane at all times and had difficulty rising from chairs. Over the course of the following year, she intermittently reported continued pain and swelling, but x-rays were normal, and a January 2003 exam showed normal strength in the lower extremities. In January 2004 Cartwright told her treating physician that she was able to get along adequately by "taking Bextra, using a hinged knee sleeve and being careful how she gets around."

Cartwright's records also show a history of hand pain. In 1998 she underwent carpal tunnel release surgery. An EMG performed in January 2002—just a few weeks before she started at H&R Block—was consistent with "moderately severe carpal tunnel syndrome." On the day of Cartwright's knee replacement surgery, a post-operative examination revealed that although her upper-extremity strength was "generally functional," her grip strength was reduced, worse in the right hand than the left. The doctor noted, however, that his ability to fully examine Cartwright was limited by the presence of post-operative IVs.

In July 2002 Cartwright told Dr. Sosenko, a rheumatologist, that the fifth finger on her right hand locked occasionally. But testing during this visit showed full muscle strength in the upper extremities. About six months later, in January 2003, Cartwright told Dr. Sosenko that she had some pain in her hands and in her right arm. At that visit, the doctor noted that there was "no numbness, no tingling." Dr. Sosenko also reported that Cartwright had full muscle strength in the upper extremities both at that visit and at her visit in July 2003.

On January 22, 2004, Cartwright told Dr. Sosenko that she was experiencing pain in her right hand. The doctor noted tenderness and "thickening of the flexor tendons," and tentatively diagnosed flexor tenosynovitis, an inflammation of the tendons of the hand and wrist. *See Stedman's Medical Dictionary* 1795 (27th ed. 2000). Cartwright underwent four weeks of physical therapy, but progress notes state that she continued to report pain and swelling. In March 2004, Dr. Cohen, a hand specialist, recorded that Cartwright had "pretty good range of motion of her hands, wrists, and fingers bilaterally," but had obvious "triggering"—involuntary bending of the fingers—in her right and left index fingers and her right middle finger. Dr. Cohen diagnosed "stenosing tenosynovitis" involving the triggering fingers and "de Quervain's tenosynovitis involving her left wrist."

At the hearing before the ALJ on April 1, 2004, Cartwright testified regarding her impairments. Regarding her knee, Cartwright said that she alleviated pain and swelling in her right knee by keeping her leg elevated on average about 50% of the day. She stated that her orthopedic surgeons and a nurse had advised her to elevate her leg, though she did not say when this advice was given or when the need to elevate her leg began. At another point in the hearing, she acknowledged that when she complained of pain to one of her orthopedic surgeons, he told her to "get off the cane, use the knee, get back to [her] old routine."

Cartwright also testified that she suffered from pain, triggering, and weakness in her hands and arms. Her testimony focused on symptoms and treatment occurring *after* Dr. Sosenko had tentatively diagnosed tenosynovitis in January 2004 and referred her for physical therapy. Cartwright testified that she

was taking "a lot" of medicine which caused drowsiness and fatigue for a couple of hours each morning, during which time she had difficulty concentrating and focusing.

Cartwright said that she left Check Free in December 2002 because her knee was too painful but was then able to work at H&R Block because she could alternate between sitting and standing throughout the day. She said that H&R Block called her in 2004 to ask her to return, but she was unable to do so because of her knee, and because she suffered from stress and depression because of her condition. Her hand impairments, she said, were also an obstacle to returning to H&R Block.

A vocational expert testified that a person limited to sedentary work which required only occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs would be able to perform Cartwright's past work as a technical associate and software support clerk even if she needed to alternate between sitting and standing every thirty minutes. When asked hypothetically whether Cartwright could perform her former work or any work in the national or local economy if she had to elevate her legs to stool height, the vocational expert said no. The expert also testified that she could not perform her past work if she had "limited use of her upper extremities."

Ultimately, the ALJ determined that after January 22, 2004—the date on which Dr. Sosenko tentatively diagnosed tenosynovitis and referred Cartwright to physical therapy—Cartwright was able to use her hands for fine or gross manipulations for, at most, one-third of an eight-hour workday. In light of this limitation, the ALJ found that Cartwright was disabled as of January 22, 2004. In contrast, the ALJ found that Cartwright was not disabled during the period from April 16, 2002, until January 22, 2004, because the medical evidence did not support finding any limitation on her use of her hands during that period.

## II.

On appeal Cartwright contends that her hand impairment was disabling as of April 16, 2002, and so she is entitled to back benefits from that date through January 21, 2004. We will uphold the ALJ's benefit determination if it is supported by substantial evidence. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 388 (7th Cir. 1992). Substantial evidence is what "a reasonable person might accept as adequate to support a conclusion," which may be something less than the preponderance of the evidence. *Id.* at 388-89.

Cartwright contends that the ALJ failed to give proper weight to the evidence presented. Specifically, she notes that during 2002 and 2003 (1) she complained of

pain and numbness in her hands, (2) a doctor found reduced grip strength in her hand and diagnosed arthritis, (3) results of an EMG indicated bilateral carpal tunnel syndrome, and (4) DDS examiners found that she was limited to using her hands for not more than two-thirds of an eight-hour workday.

First, Cartwright argues that the ALJ failed to give proper weight to medical record reports of hand pain and stiffness in 2002 and 2003. Cartwright complained of hand pain during three visits to Dr. Sosenko between April 16, 2002, and January 21, 2004. Each visit is discussed in the ALJ's opinion. But the ALJ correctly noted that the records of these visits indicate that Cartwright had "full muscle strength in the upper extremities," no numbness, tingling, or swelling in the joints of the hands, and "no symptoms of weakness in the upper extremities." The ALJ was justified in concluding that these intermittent reports of pain were not sufficient to establish functional limitation during the contested time period.

Second, Cartwright insists that the ALJ ignored the fact that a doctor "observed weakness in the grip strength[] and diagnosed arthritis." Cartwright attributes this finding to her rheumatologist, Dr. Sosenko, but no record cite accompanies this contention in her brief and we are unable to find any such observation in Dr. Sosenko's treatment notes. Dr. Sosenko did document arthritis in Cartwright's right knee in November 2001, and in March and July 2002 she documented osteoarthritis—a type of arthritis that mainly affects weight-bearing joints like the knee and hip, *Stedman's Medical Dictionary* 1282 (27th ed. 2000)—but apparently never diagnosed arthritis in the hands.

Perhaps Cartwright intended to reference Dr. Deppe's record of Cartwright's examination on June 5, 2002, the day she had knee-replacement surgery. Dr. Deppe, who apparently examined Cartwright only during her post-operative hospitalization, noted "[a]rthritis with right hand weakness" that would be "further evaluated." The record does not direct treatment, testing, or even follow-up, nor does it indicate that Cartwright's apparent arthritis caused any functional limitation, although Dr. Deppe suggested that Cartwright might benefit from using "adaptive equipment to facilitate opening jars at home, which is difficult for her."

Cartwright does not point to any other evidence that she was diagnosed with, treated for, or limited by arthritis of the hands before January 2004. *See* 20 C.F.R. § 404.1529(c)(3) (stating that evidence of treatment and of functional limitations will be taken into account to evaluate the intensity and persistence of symptoms). Cartwright points out that Dr. Heffernan, her primary treating doctor, diagnosed arthritis in the right hand and treated her with Naprosyn, but this occurred in April and May of 1999, almost three years before Cartwright's claimed onset date. Although the record contains extensive notes from Dr. Heffernan during the relevant time period, none mentions arthritis of the hands.

Third, Cartwright argues that the ALJ's finding cannot be reconciled with an EMG performed on January 10, 2002, which revealed that she suffered from moderately severe bilateral carpal tunnel syndrome. However, Cartwright began work as a receptionist at H&R Block on January 26, 2002, less than three weeks after this test was performed. She worked there until April 15, 2002, leaving only because it was a temporary position that ended with the tax season. The job required her to write, type, and handle small objects for approximately four hours per day. Cartwright did not report that her hand problems troubled her while she worked at H&R block. In fact, when given an opportunity to go from a part-time to full-time position, Cartwright readily acquiesced to a longer workday. The fact that Cartwright engaged in substantial gainful activity after the EMG revealed carpal tunnel syndrome undermines the weight which she would assign those test results.

Finally, Cartwright contends that the ALJ erroneously ignored the DDS examiners' finding that she was limited to no more than frequent fine and gross manipulation secondary to bilateral carpal tunnel syndrome. Cartwright failed to raise this point before the district court, and thus it is waived. *See Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). Regardless, the argument is unavailing. During the contested time period, the medical records of Cartwright's treating doctors do not include a single mention of an abnormal medical test, course of treatment, or functional limitation with respect to her hands. The DDS examiners based their opinions on Cartwright's medical records. As Cartwright herself noted before the district court, their opinions are "of limited value as they did not examine [her]." The ALJ determined that the medical evidence of record did not support a conclusion "that, prior to January 22, 2004, she had limited manipulative ability." That determination was justified given the limited nature of the DDS review and the lack of corroborating evidence in the records of Cartwright's treating doctors during the contested time period.

Cartwright's second argument is also unsuccessful. She claims that the ALJ erred by failing to credit her testimony that she elevated her leg, on average, about 50% of the day in order to reduce swelling and alleviate pain. Also, she asserts that her medication caused her to suffer fatigue. Cartwright's testimony on these two points established only that she had these problems at the time of the hearing in April 2004. Cartwright did not testify that she had been elevating her leg or suffering from fatigue during the contested time period of April 16, 2002, through January 21, 2004. The ALJ found that Cartwright *was* disabled in April 2004, thus Cartwright's argument that the ALJ "failed to credit" her testimony on these points is ill-founded.

Moreover, the record evidence does not support an inference that Cartwright was required to elevate her leg during the contested time period. Where swelling is

noted in these doctors' medical records, it is characterized as "mild" and "occasional." Cartwright does not identify—and we were unable to find—a single instance in the record where a doctor recommended elevating the leg let alone required it. An orthopedic surgeon who handled Cartwright's follow-up care after her knee replacement surgery said Cartwright would be released for "full activities" in December 2002, and he urged her to "get off the cane, use the knee, get back to [her] old routine." Neither statement is consistent with requiring her to elevate her leg 50% of the day. Thus the ALJ was justified in her conclusion that the record evidence did not support finding that Cartwright needed to elevate her leg from April 2002 through January 2004.

The ALJ's decision demonstrates a thorough familiarity with the medical evidence and that evidence substantially supports her findings. Therefore, the district court's judgment upholding the decision of the ALJ is AFFIRMED.